Pimlico, LLC v. Commissioner of Internal Revenue Good morning, Your Honors. Jeremy Temkin, Morvillo, Brownwoods, Grandi, Sandello, Petitioner, Appellant, Pimlico. May it please the Court, this case was tried and fully submitted to the Supreme Court. In less than six months before he retired, the tax court judge issued a 12-page decision that contained no citations to the record, made no credibility findings, did not refer to the testimony of a single fact witness, did not address the extensive testimony and other evidence presented by the five textbook witnesses retained by the The tax court's failure to grapple with a factual record in its short and belated opinion affects each of the four independent bases the Court relied on to uphold the final partnership and administrative adjustment. I'd like to address each of the four bases in the order they appear in our papers. First, with respect to the disguise sale, under the Internal Revenue Code, as it existed before Congress amended the relevant provisions in 2004, Santa Barbara's basis in the duplicadas that they contributed to the Xbox partnership was transferred to Pimlico and ultimately to PICC-IRC. The tax court's principal ground for affirming the partnership administrative adjustment was its finding that Santa Barbara's contribution to the duplicadas was a disguise sale, and therefore that its basis was not transferred up to the other partnerships. In making that finding, the tax court relied on the presumption that when a partner receives a payment within two years of having transferred property, the initial transfer is presumed to be a sale rather than a partnership contribution. At first, the service attempted to trigger the disguise sale presumption through account statements and wire transfer records that purported to show funds flowing from Xbox to Santa Barbara in January of 2003. Petitioner's trial counsel objected to those records on hearsay grounds and specifically argued that they were over a decade old and that he should have the opportunity to challenge their accuracy. In response, the IRS's counsel acknowledged that he had unsuccessfully attempted to obtain a business record certificate, and the trial judge made clear that he would not leave the record open, and the IRS attorney withdrew the challenge exhibits. These are the exhibits that showed the transfer from Xbox to Santa Barbara that would have shown had they been properly admitted and subject to a challenge by the petitioner. Nine years later, however, Your Honor, when he was drafting his decision on the cold record, the tax court judge apparently forgot about the hearsay objection, the ensuing that purported to reflect an actual payment. Instead, and without prompting from the IRS, the tax court relied on other equally inadmissible bank records to piece together what can only be referred to as a convoluted inferential chain that served as a linchpin to the disguise of self-reliance. The record reveals ecologically with respect to certain records, 35J and 46J, as to which counsel for your clients stipulated to their authenticity, if not their admission, I believe seems to be a little bit confused about whether these bank records were objected to or not. Assume they come in. I want to sort of bring it to a high level for a second. In August 2002, Gramercy sets up this arrangement where they get these receivables contributed to these three-tiered partnerships. And a few months later, Mr. Howard contributes $300,000. Within a month or two, that goes to Santa Barbara. If we let in that evidence, if we decide that there's a waiver as to its admissibility. Then, a few months later, Mr. Howard and the Yes. The partnership. The partnership. This is the partnership level. Right. And Mr. Howard also claims it, right? Because he's a partner, not of Xbox, right? He is not a partner of Xbox. He's a partner of PIMLICO and of PICC-IRC. So, he's not a partner of Xbox. No. What's the economic, how is that not obviously a sham partnership? What was the economic purpose of these partnerships? Your Honor, there was extensive testimony at trial, which the task force judge did not address. But there was extensive testimony that the duplicatas had significant value. And that Gramercy had a reputation and significant experience monetizing similar distress debt. There was also operating agreements, contribution agreements. It's made clear that at the time of the contribution, which is the key point in time, at the time the partnership was formed, there was no agreement that would assure Santa Barbara of any return. And this distinguishes the case before Your Honors and all of the distressed asset debt cases that the commissioner relies on. You mean the Judge Posner case, superior trading. You think that's distinguished? It's distinguishable because… Why is it distinguished? Because in that case, there was a commitment prior to the transfer of the receivables. There was an assurance that the transferee, in this case Santa Barbara, would get reimbursed. Also, in the other cases cited by the commissioner, the entity that is liquidating or monetizing the distress debt, so in this case Gramercy, did not have experience doing so. And the investor, in this case Mr. Howard, in those cases did not have any experience in distress debt investing. So Mr. Howard had significant experience investing in distress debt. Did he do anything to monetize that debt? He was not the major partner of the partnership. Did anyone do anything to collect? Your Honor, as between the time that the partnerships received the receivables, so there is no evidence of what steps were taken to try and attempt to monetize it. So the record is silent on whether there was anything done to monetize. So the whole purpose of this was the shelter? Your Honor, Mr. Howard testified at trial, and the tax court judge did not make any credibility findings. Well, he made general findings. I mean, he said it's clear that Xbox was formed solely as a conduit to execute a disguised sale of the end call receivables. He said this was a preconceived step to shift bases to Mr. Howard. I mean, he said a lot of things. He just didn't go into a lot of detail. Well, wait, wait. Your Honor, if the tax court judge who observed the witnesses doesn't make credibility findings, I think Your Honor has to accept or should accept Mr. Howard's testimony at face value, which is that he understood that this was a potential profit-making venture. The commissioner's expert, Ms. Murray, testified regarding Gramercy's experience and reputation for being able to monetize similar distressed debt instruments. And he came in four months after the partnerships were created. Yes, and there were agreements at each level, Your Honor. I see my red light is on, so I'll sit down. Good morning. May it please the Court, my name is Jennifer Rubin, and I represent the Commissioner of Internal Revenue in this case. This court should affirm the rejection of these artificial tax losses for any one of the four independent reasons decided in the tax court. In particular, Kimberley did not satisfy its high burdens to establish that all of the partnerships involved were bona fide and not shams, and that the transfers here were not a disguised sale. I'd like to start with the sham partnership, because I think it is the easiest and cleanest of these, because there's simply no evidence of any partners, alleged partners, intent to participate as an affiliates in these partnerships other than Mr. Howard. So even if you take his testimony at face value, which there is reason not to in the record, but let's assume for the moment that he did in fact think that he was going to keep it. Well, what about your adversary's argument just now that in the absence of credibility findings, we're essentially obligated to take Mr. Howard's testimony at face value? Do you agree with that? I definitely do not agree with that. Looking at the evidence you can make, the tax worker definitely raised inferences from the evidence to show that that Gramercy fully intended at all times for this to be a tax shelter, for this to simply be something where they got the receivables from Santa Barbara, moved it through these partnerships, sold it at a loss to one of its own affiliates, and created a gigantic tax loss to pass on to Mr. Howard. And the fact is, you look at Santa Barbara, as soon as there was an investor in place that said, hey, give me the exact same amount of money that investor gave to you, immediately that letter was drafted by Gramercy, and then that letter was sent along to Xbox management to try to get that money out of them. And that is a reasonable inference to say, yes, Xbox was solely in contact with it. And there's no reason that this trial court, like any other trial court, can make inferences from the evidence, and that's what they did. And under clear error, you look and say, is there evidence that supports it? And the answer is yes. We've pointed to all of the record evidence that shows each of those steps and makes those inferences completely reasonable. But as far as the CHAMP partnership goes, there's no direct evidence at all of the intent of Santa Barbara or of Gramercy, the Gramercy entity that participated in Xbox. There's indirect evidence that you can take that I just went through, talking about how they went through this so quickly, put in those receivables, move them through the partnerships, get some of the lost to a Gramercy affiliate, give money back to Santa Barbara. But there's really no evidence of actual intent to connect the business together. And what's more, there's really no proof of business activities other than that shoveling along to create the loss. So the Xbox, as Superior Trading points out, Xbox, that one partnership alone, is a shill. The entire tax loss fails right there. Now, Xbox and the Gramercy affiliate in tall ships were also partners in the other two partnerships, Pimlico and Picker. Now, again, there's no evidence of bearing to it. We already know that Xbox, as was already pointed out, was itself a shill. And again, there's no telling of intent on their part to participate in the business. But then you turn to tall ships, and again, there's no evidence of any intent on its part to do anything other than be part of this Gramercy chain of moving those receivables along, getting the money back to Santa Barbara, creating the tax losses for Mr. Howard. And that's enough right there. As my colleague noted in his opening, and I re-noted here, these are for any kind of reasons. And if you just determine that you should affirm unchained partnership alone, then that's enough to affirm the tax quote. Turning to the Scott of the Sale, it was a little bit murky in my opponent's argument, but the fact is, in this case, it is not unusual in tax court cases for parties to stipulate both authenticity and admissibility of evidence. And that's really what happened here for all the documents, except a few specific exhibits that were referred to by number. And the tax court mailed it down after the commissioner's counsel said, I'm going to withdraw those because I don't need them. There's enough in the record that says, hey, don't object to any of the exhibits in the next 10 minutes. It is waived. And they didn't object. Now, earlier in the case, they'd actually already said, you know, we agree to the admission of all the other exhibits. But that point, that was their opportunity to flip back through those exhibits and say, is there anything else you want to raise in objection? Could you just clarify which documents, as to which there was a stipulation and therefore were admitted, what they actually show in terms of money going back to Santa Barbara? Okay. It did require an inference as to money going back to Santa Barbara. So what you have is, how is money going into his account and money going back to Xbox again? And then after Santa Barbara makes its request of Xbox to give me that exact same amount of money that Mr. Howard put in, you have an almost exact same amount of money exiting Xbox's account by the end of that month. And so the tax court said, I'm going to raise an inference here. There's been no explanation as to where this money went other than it going to Santa Barbara. We know that Gramercy drafted the request. We know Santa Barbara submitted the request. And we know this money left the Xbox. So we have a request for a certain amount from Santa Barbara, and then we have a transfer out of the account of Xbox. Yes. Around the same time. Exactly. I think there was like a $50 discrepancy that might be explainable by interest going into the account because it was an interest-bearing account. And we would have to find clear error to say that the tax court's inference was incorrect. That's absolutely correct. This is subject to clear error. And once you have that presumption in place, then it was very heavy burden. They have a heightened burden there to clearly establish that this was not a sale, and they utterly failed to do that. They have never disputed that Xbox would not have paid this money but for Santa Barbara's transfer of the receivables to Xbox. And they have never disputed that the funds came from Howard and were not dependent on the nonexistent partnership operations. And one thing to note about this, there's a whole lot of arguing in the briefs about whether Santa Barbara was subject to entrepreneurial risk, because the briefs say it was historic. It was not. But the fact is the standard under the disguised sale rule is whether the transfer came from entrepreneurial risk. And here it didn't. It came from sales. What does that mean, entrepreneurial risk? It's basically where you're putting money into a business, and maybe the business succeeds, and the money grows. And maybe the business fails, and you lose the money. It's not simply, hey, I'm giving you these receivables to hold, and I'm hoping at some point you'll pay me. And that's a Virginia story. So another sort of high-level question, because I'm curious. Encol was this infamous Brazilian bankruptcy, and Santa Barbara is out $28 million or something as a result of nonpayment. Do you know what Santa Barbara did on its taxes in Brazil? Did it take a loss of $20-some million or not? We do not know, because none of the Santa Barbara financials were ever put to the record. None of the experts were able to examine them. There was no testimony from Santa Barbara. What we do know is in 1999, the bankruptcy court said we're going to liquidate Encol, because it doesn't even have the money to pay all of its priority debts. You know, Santa Barbara has never even put in its non-priority debt as a claim from what we know. And in addition to saying that Encol can't pay its debts, it also said it was brought all over the place. And so the claim that there was some thought that Encol could exit bankruptcy and somehow be making enough money to pay all of these debts, including this non-priority debt that was never actually submitted to the bankruptcy court, our experts said that that was just really not reasonable at all. But you don't even need to reach that question as to whether there was ever any substance to Mr. Howard's claim that even though he didn't know what these receivables were, he didn't know what was going on, to try and monetize them, which was nothing. You don't even have to reach those messy questions as to whether Howard really believed it and whether it was reasonable to believe it, because these were sham partnerships and because this was just some sale. If there are no further questions, I will now turn it over to you, sir. Your Honor, I want to respond first to the culprits in the sham partnership point that Your Honor raised. There is a test. There's a five-minute test to assess whether a partnership is a sham partnership. And that test is the Luna test, which this court has applied in a state of conduct. And the Luna test sets forth a number of factors that are to be considered. Some of them are objective factors. Some of them are subjective factors. It's clear that the tax court never addressed any of the Luna factors. It simply jumped to a conclusion, but there was clearly evidence in the record that would support a conclusion that Xbox and PICC-IRC were both bona fide partnerships. There were contribution agreements and operating agreements. There was evidence, including expert testimony from Ms. Murray and fact testimony from Mr. Howard regarding Gramercy's well-regarded investment manager, and they specialize in monetizing foreign distress debt. There was testimony from Petitioner's experts, Professor Fishlow and Camargo, that a reasonable investor could see value in the duplicadas in light of economic circumstances in Brazil. And my colleague's argument that there was evidence regarding the end call bankruptcy and whether there could be any recovery, the problem with that argument is that the judge made no findings. There was evidence on both sides of that issue, and the judge simply passed over it. And in the Menefee case, and I think Portado, Drake versus Portado, this court has made clear that fact-finding, that a district court or a trial court in this instance is required to make factual findings and that it can't simply pass over evidence. And here, there were at least two instances in the opinion where the judge said there was no evidence when clearly there was evidence on a particular point. Can I just ask you to go back to the disguise sale for a moment? And let's assume for the moment that we disagree with you as to whether the presumption arises or not. Could you just marshal for me how the record, in fact, clearly establishes that the transfers between Santa Barbara and Xbox were not a sale? Thank you, Your Honor. So I'll try to do that succinctly. The issue of entrepreneurial risk is measured at the time of the contribution, not what happens subsequently but at the time of the contribution. And at the time of the contribution, we have Gramercy's expertise in liquidating and monetizing more distressed debt. We have the Brazilian economic situation, which made investing in distressed debt in Brazil attractive and potentially very profitable. We have the fact that there is, unlike all the other disguised sale cases, there is no agreement or commitment to pay Santa Barbara a penny for these. So in all the other cases, and specifically the Route 231 case and the Virginia historical case, there were promises of payment in the party's agreement. And if the party that contributed the assets wasn't paid, it got the assets back. Here there's no agreement. So any chance of recovery that Gramercy would depend on Gramercy's ability to liquidate the duplicates. So you think that the evidence – there was evidence in the record that would have supported a finding that there was – the payment was contingent on entrepreneurial risk. And the fact of the matter is that the trial judge simply ignored it and cut a corner that was, quite frankly, after waiting nine years for a decision in this case, to not have him grapple with the difficult issues. These are not easy issues. But for him to simply ignore them completely is reversible, and we would ask this court to reverse and to remand it for a reconsideration. Thank you both, and we will take the matter under advisement.